CRANDAL v. WALTERS and another.*

(Circuit Court, S. D. New York. December 13, 1881.)

1. LETTERS PATENT—BOX-LOOPS FOR CARRIAGE TOPS—REISSUE.

The original patent No. 95,004, September 21, 1869, was for "a box-loop, struck up or cast from one piece of thin metal, with lugs or spurs upon its edges, and applied to a carriage top by passing said lugs through the same and through a metal plate, and bending them down upon the surface of said plate." *Held,* that the invention was really of the *loop* ready to be affixed, and that the *plate* was only an adjunct, making the article better, but not of the essence of the invention, and that a reissue which claimed " the box-loop formed out of thin plate metal, with lugs or spurs projecting therefrom to affix it to a carriage top, either with or without the plate," was good and valid.

2. INFRINGEMENT.

Reissue No. 6,974, for a box-loop having a top and two sides, with lugs or spurs projecting from the edges or corners next the surface to which they are to be applied, *held* to be infringed by a loop having a closed bottom, with lugs punched out of the bottom.

3. NOVELTY—ADAPTATION OF OLD APPLIANCES.

Almost all inventions at this day that become the subject of patents are the embodiment and adaptation of mechanical appliances that are old. In that consists the invention.

4. DOUBLE USE.

Where an article exists in a given form, and applied to a given use, and is taken in substantially the same form and applied to an analogous use, so as to make a case of mere double use, there is no invention.

5. PRIOR DEVICE NOT ANTICIPATING PATENT.

A device will not anticipate a subsequent patent where it cannot be used as a substitute for the device described in the patent without invention.

In Equity.

*Neri Pine* and *Charles M. Stone,* for plaintiff.

*A. v. Briesen,* for defendants.

BLATCHFORD, C. J. This suit is brought on reissued letters patent No. 6,974, granted to Charles H. Davis, March 7, 1876, for an "improvement in box-loops for carriage tops;" the original patent, No. 95,004, having been granted to him September 21, 1869. The specification of the reissue is as follows, reading what is outside of brackets and what is inside of brackets, and omitting what is in italics:

"*Figure* 1 *is a perspective view of the loop, with straps and buckles complete, attached to a piece of leather or section of a carriage top,* B. *Figure* 2 *is a perspective view of the loop ready for use. Figure* 3 *is a plate or cap used on the back or inside of the top,* B, *for securing the loop,* A. *Figure* 4 *is a cross-sectional view of the whole complete. Similar letters of reference indicate corresponding parts.* My invention has for its object [an improvement in] to *improve* the construction of box-loops for carriage [tops,] trimmings, [etc.]

*Reported by S. Nelson White, Esq., of the New York bar.

and it [It] consists in forming the loops [in] *from one piece of* metal, either cast or struck up [into form from one single piece of plate or sheet metal,] with a series of [spurs or] lugs [projecting from the] *upon its lower* edges *or corners next the surface to which they are to be affixed,* which [spurs or lugs] *lugs or spurs* [pass] *are passed* through *openings formed in* the carriage top [or curtain] and [are clinched down tight upon it, and I introduce] *through openings in* a metal *stiffening* plate [on the opposite side] *placed upon the under surface* of the *leather,* [leather, as a stiffening plate, through which the spurs pass before they are clinched, as a further security in the fastening, by which form and construction I securely affix the box-loop to the curtain, etc.,] *The lugs are then bent down or clinched upon the metal plate, thereby securely fastening the box-loop in place* without the employment of rivets or screws. Box-loops, as usually constructed, are made of leather, and either sewed or riveted in [place,] place, *and* [They] are liable to be bent out of shape and torn from [their fastenings;] *the rivets,* [and this] *This method* [mode of construction and application] is [slow and] expensive, requiring the labor of skilled workmen, while, by my improvement, the box [loop can be] *is* easily applied [by any one] and [is] not liable to get out of order. In the accompanying drawings [which form a part of this description, figure 1 is a perspective view of the loop, either cast or struck up from thin metal, affixed in place with buckles complete. Figure 2 is a perspective view of the loop detached. Figure 3 is the stiffening plate, C.] A is a metal loop, either cast or struck up from [thin] *sheet* metal, preferably the latter. [latter, which] *When formed of sheet metal the blanks* are cut out by suitable dies, [with] *leaving spurs or lugs* [lugs or spurs formed at] H, H, upon [the] two [sides] *opposite edges.* [The loop is then] *They are* bent into *the* form [and stamped or embossed, as in figures 1, 2, or otherwise, which completes the manufacture of the loop, which is then ready to be affixed in its place, B, figure 1. To apply this loop to a carriage top, or elsewhere, the spurs or lugs, H H H, are thrust through holes or slits made therefor in the leather, and the ends are bent and clinched down upon the other side. Buckles may be affixed to their place on B, as in figure 1, in any convenient way, and the loop put over them and affixed to B. As an additional security, plates, C, (see figure 3,) are employed on the opposite side of the curtain, to stiffen and support the fastenings or supports, H, which are clinched down on them after passing through openings therein for the purpose.] *shown in figure* 2, *to produce the loop. D is a strap or straps, each end passing around and through the buckle, E, and secured, in any proper manner, to the piece, B, of the carriage top. The piece, B, is provided with a series of holes upon each side of the strap, D, corresponding in number and position to the spurs, H, upon the loop. The loop is applied to the piece, B, by passing the spurs through these holes, as shown in the drawing, and through holes, X X, formed in the metal plate, C, laid against the inner surface of the piece, B. The lugs are then bent down or clinched upon the surface of this plate, thereby firmly securing the loop in place without the aid of rivets.*"

Reading in the foregoing what is outside of brackets, including what is in italics, and omitting what is inside of brackets, we have

the specification of the original patent. The claim of the reissue is as follows:

"The loop-box, A, formed out of thin plate metal, as described, with the lugs or spurs, II, projecting therefrom, to affix it to a carriage top, either with or without the plate, C, substantially as and for the purposes specified."

The claim of the original patent was this:

"The box-loop, A, when formed as described with the lugs or spurs, II, upon its edges, and applied to a carriage top, by passing said lugs through the same, and through the metal-plate, C, and then bending them down upon the surface of said plate, substantially as described, for the purpose specified."

It is apparent that the article specified in the claim of the reissue is to be (1) a box-loop; (2) made of metal; (3) the metal so thin that the article can, if desired, be struck up from it; (4) the metal of the loop to be a single piece, bent into shape; (5) the lugs to project from the loop towards the surface of the material to which the loop is to be affixed; (6) the loop to be capable of being affixed by passing the lugs through the material and clinching them down tight upon the other side, the clinching being done by bending them at right angles, and no rivets or screws being employed. These characteristics are all found in the specification of the reissue in connection with its claim. They are all found in the specification of the original patent. The drawings of the two patents are the same. The model filed with the application for the original patent shows all the foregoing characteristics. The claim of the original patent was so framed as to seem to require that the loop should be actually applied to a carriage top, in order to infringe. It also required that the metal plate, C, should be used in such application. Makers of loops were not makers of carriages, and it was obvious that the invention was really of the loop ready to be affixed, and that the inventor was entitled to have a claim which would reach the maker of the loop. Besides, even if the claim of the original would have extended to the maker of the loop, it might have been questioned whether it would reach him when he made a loop without the plate, C; and it was plain that that was only a stiffening or strengthening plate, an adjunct, making the article better, perhaps, but yet not of the essence of the invention. The case was, therefore, one for a reissue.

It is objected that the specification of the original patent says that the series of lugs is on the lower edges of the loop; that is, projecting from the lower edges of the long parallel sides of the loop and in the same plane with such sides. The drawings and model show such a construction. The reissue says that the lugs project from the

edges or corners next the surface to which they are to be affixed. The plaintiff's loop has an open bottom, the metal being only on the top and the sides. The defendants make one form of loop with a closed bottom, and with lugs punched out of the bottom at three sides of the lug and bent down at the fourth side, ready for use, and standing at right angles to the sides of the loop and in the same plane with each other. To maintain non-infringement, and yet enable themselves to appropriate the real invention, they contend that the claim of the reissue is a departure from the invention shown in the original, (1) in making it necessary only that the lugs should project from the loop, without limiting them to being arranged as in the drawings, on the lower edges of the sides; (2) in making it necessary only that the lugs should be used to affix the loop, without its being necessary to use them by putting them through the carriage top; (3) in making it optional to use the plate, C. It is clearly a mere formal alteration, and within the invention, to put on the closed bottom and make the lugs project from it, instead of making them project from the edges of the sides. The closed bottom or fourth side is a useless expenditure of labor and material, so far as the real invention and the employment of it are concerned. The defendants' lugs project in a manner entirely equivalent; and if the claim of the reissue had said, as did the claim of the original, that the loop had lugs on its edges, it would have been proper to say that, for all practical purposes, the defendants' lugs were upon the edges, the variation being immaterial. The claim of the reissue is not capable of the construction that the lugs are to be used without putting them through the carriage top. It was no departure and no new matter to make the use of the plate, C, optional. To say that the lugs of the patent project from the edges or corners next the surface to which they are to be affixed, is just as accurate a description of them as to say that they are upon the lower edges of the loop. It is from the edges next the surface to which the lugs are to be affixed that the lugs project. There is no statement in the reissue that the lugs are not to project from the edges, and calling the edges corners does not alter their location. It is plain that the forms of loop shown in "Complainant's Exhibit 2" and in "Complainant's Exhibit 3" infringe the claim of the reissue, and that the reissue is not open to the objection that it is not warranted by the original patent.

The remaining question is that of novelty. Various old devices are introduced wherein sheet-metal prongs or lugs projecting through a material, such as leather or paper, and clinched by bending them,

held and secured the metal or other article to which they were attached on the other side of the materials. This idea was old, and was embodied and used by Davis. But no article like the plaintiff's, capable of being taken and used for the purposes for which the plaintiff's can be used, without alteration and adaptation requiring invention, existed before. Almost all inventions at this day, that become the subject of patents, are the embodiment and adaptation of mechanical appliances that are old. In that consists the invention. When the thing appears it is new and useful. No one saw it before; no one produced it before; it supplies a need; it is at once adopted; all in the trade desire to make and use it; yet it is said to have been perfectly obvious, and not to have been patentable. Where an article exists in a given form and applied to a given use, and is taken, in substantially the same form, and applied to an analogous use, so as to make a case of merely double use, there is no invention. But it is very rarely that a thing of that kind secures a patent.

A patent to Joseph E. Ball, No. 20,246, granted May 18, 1858, for a mode of attaching the traces of harness for horses to the draught plates or straps, is adduced. Ball's apparatus could never be used as a loop for a carriage top. The metal was not so thin that it could be practically struck up from a single piece and be bent into shape. The lugs could not be practically clinched by bending them, but were secured as rivets, by a process entirely inapplicable to the use of a loop on a carriage top.

A patent granted to Robert Meyer, No. 61,628, January 29, 1867, for a buckle fastening, is relied on. That does not show lugs clinched by bending, but shows only pins secured by riveting. For some purposes, in considering questions arising on letters patent, bent lugs and riveted pins may be the equivalents of each other; but, in considering the question of the novelty of the plaintiff's loop, riveted pins are not the equivalents of the bent lugs. The Meyer device could not be used in place of the Davis device without adaptation requiring invention.

The defendants also introduce a patent granted to Charles H. Littlefield, No. 67,322, July 30, 1867, for an improvement in breastplates for harnesses. It is a piece of metal bent into a loop at one end to hold a buckle, and allow the tongue of the buckle to pass through a slot made in such bent end, and having wings or projecting pieces turned over so as to overlap a harness strap. This could not be used as a substitute for the plaintiff's loop without invention. It

is casy after the desired thing is obtained to see how an old thing could have been adapted or altered.

The Ball, the Meyer, and the Littlefield patents were all of them considered by the patent-office in granting the original Davis patent, and the Ball patent was again considered by it in granting the reissue, as appears by the record.

The defendants also adduce English patent No. 1,204, dated May 13, 1859, to William S. Thomson, for "improvements in the manufacture of hooped skirts." Their expert, with the Davis device and the Thomson device before him, has cut away parts of the former and claims to have converted it into the latter. It may not be difficult for ingenuity, with both articles in view, and with the problem given to convert the later one into the earlier one, to do so. But the inventor of the earlier one had only that one, and did not produce the later one. There is nothing in the Thomson device to suggest the Davis box-loop. It required adaptation and invention to convert it into the box-loop. An exact reproduction, in a model, of figure 8 of the drawings of the Thomson patent shows that there is no identity between it and the Davis structure.

The French patent to Fransson, No. 25,417, granted November 15, 1855, for a clinched fastening for gloves, may also be dismissed. It contains several features which are availed of in the Davis loop, yet to pass from it to that required adaptation beyond that existing in a mere double use.

It is not necessary to allude to the numerous other old patents introduced by the defendants. The foregoing remarks apply to all of them, and also to the alleged prior structures, respecting which oral testimony is given. Attention is directed by the defendants to an exhibit of theirs marked "Bolt-guide and Catch," alleged to represent a prior structure. The exhibit is not claimed to be a structure which was actually made before Davis' invention, but only to represent one. It is a bolt-guide consisting of a metal plate, with two three-sided metal loops on it, each loop open at its two ends, which open ends are lengthwise of the plate, this plate being intended to be placed on one article, and of another metal plate, with one three-sided metal loop on it, open at its two ends, which open ends are lengthwise of the plate, this plate being intended to be placed on an adjoining article. Each loop has on it, projecting downward from the lower edge of each vertical side of it, a spur or lug, integral with it, and passing through a slot in the metal plate, and bent over and clinched down on the opposite side of the plate. The exhibit in question is intro-

duced by a witness who states that it is "a guide for a sliding bolt and a catch into which the bolt would slide when the article is put in use," and that he has known articles similar to it to have been in public use and on sale in the United States for nine and one-half years before January 15, 1881. This would carry it back to July 15, 1871. The application for the original Davis patent was filed April 22, 1868. Moreover, the attention of the witness was not directed to the feature of the bending over of the lugs, to clinch them, as distinct from riveting them. It does not appear that the metal used prior to Davis' invention, in making any such bolt-guide and catch, was so thin that the article could be or was struck up from a single piece of metal. Another witness states that, to his knowledge, bolt-guides were made on the plan of said exhibit, but larger, nearly 20 years before January, 1881, the loops being fastened to the bottom plate, 20 years ago, the same as in the exhibit, clinched to the back of the plate. On cross-examination he says that they were made of heavier metal, some of them. He then testifies:

"*Cross-question* 10. Were not the ends of the hasp or staple headed down on the plate by a blow of the hammer, as in riveting, instead of being bent over or clinched, as in defendants' exhibit 'Bolt-guide and Catch?' *Answer.* As a general thing they were made in that way,—riveted with a hammer to form a clinch; they were not riveted to form a head like a boiler rivet, but were bent over like the exhibit."

Again he says that they were mostly made for heavier purposes than the exhibit. The defendant's expert says that the exhibit could be attached to a carriage curtain. The plaintiff, in his testimony as a witness, gives evidence throwing doubt on the view that the lugs in any bolt-guide were not headed down by riveting. On the whole evidence it must be held that the prior existence of the bolt-guide, made of metal so thin that the article could be struck up from a single piece of it, and with lugs clinched by bending and not riveting, is not satisfactorily shown. Besides all this, it is plain that the bolt-guide never did and never would suggest Davis' box-loop.

There must be a decree for the plaintiff for an account of profits and damages, and a perpetual injunction, with costs.